```
1                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
2                       ALEXANDRIA DIVISION

3
     RUHI REIMER,                     :
4    Individual and on behalf of      :
     others similarly situated,       :  Civil Action
5                                     :  No. 1:23-cv-00683-MSN-JFA
                     Plaintiff,       :
6                                     :
                 v.                   :  November 3, 2023
7                                     :  10:13 a.m.
     MEDIGAP LIFE, LLC,               :
8                                     :
                                      :
9                    Defendant.       :
                                      :
10   ............................. :

11
                     TRANSCRIPT OF MOTION HEARING
12            BEFORE THE HONORABLE JOHN F. ANDERSON,
                  UNITED STATES MAGISTRATE JUDGE
13
     APPEARANCES:
14
       For the Plaintiff:          BAILEY & GLASSER LLP
15                                 Gregory Yann Porter, Esquire
                                   1055 Thomas Jefferson Street NW
16                                 Suite 540
                                   Washington, D.C. 20007
17
                                   BAILEY & GLASSER, LLP (WV-NA)
18                                 John William Barrett, Esquire
                                   Pro hac vice
19                                 209 Capitol Street
                                   Charleston, WV 25301
20
       For the Defendant:          WILEY REIN LLP
21                                 Attison Leonard Barnes, III,
                                   Esquire
22                                 2050 M Street NW
                                   Washington, D.C. 20036
23

24

25     (Continued)
```

```
1      (Continued)

2    For the Defendant:          WATSTEIN TEREPKA LLP
                                 Ryan David Watstein, Esquire
3                                Pro hac vice
                                 Matthew A. Keilson, Esquire
4                                Pro hac vice
                                 1055 Howell Mill Road
5                                Suite 8th Floor
                                 Atlanta, GA 30318
6
     Court Reporter:            Diane Salters, B.S., CSR, RPR, RCR
7                               Official Court Reporter
                                United States District Court
8                               401 Courthouse Square
                                Alexandria, VA 22314
9                               Email: Dianesalters.edva@gmail.com
                                Telephone: (301) 338-8033
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings reported by machine shorthand from an FTR Gold
     recording.  Transcript produced by computer-aided transcription.
```

*Proceedings*

```
1        THE COURTROOM DEPUTY:  Calling Civil Action

2   Number 23-cv-683, Reimer v. Medigap Life, LLC.

3        MR. PORTER:  Good morning, Your Honor.  Gregory Porter of

4   Bailey & Glasser, Virginia counsel for Mr. Reimer.  With me is my

5   partner, John Barrett, who will be presenting the argument for

6   the plaintiff.

7        MR. BARNES:  Good morning, Your Honor.  Attison Barnes on

8   behalf of Medigap.  With me today is Ryan Watstein and

9   Matt Keilson; and Ryan Watstein will be arguing today.

10        THE COURT:  Well, I will tell you, I've read all the

11   pleadings that the parties have filed in this matter.  This is a

12   serious matter, and I appreciate you being here, and I'll hear

13   any argument that you want to add, but you don't have to do a

14   whole lineup about the facts and circumstances.  I'm pretty

15   familiar with what they are and what's happened here.

16        So I guess I'll let, Mr. Watstein, you start off since

17   it's your motion.

18        MR. WATSTEIN:  Thank you, Your Honor.

19        So since I know you've read everything, I won't go through

20   all the detail, but what I will say is that, you know, this is a

21   putative class action in which we currently have eight or nine

22   subpoenas for significant third-party information out.  Our

23   client has already incurred hundreds of thousands of dollars of

24   expense in this case.

25        The plaintiff, the named plaintiff, who purports to be a
```

1   representative for the class, has admittedly thrown away the most

2   critical piece of evidence in the entire case, a Windows

3   computer, when a Windows computer was used to opt in to the lead

4   in this case, where a consent is a complete defense to every

5   single claim in this case.  It's not -- this isn't a case where

6   somebody deleted a few emails that might have been helpful to the

7   defendant.  It's a case where the computer, the device, that we

8   believe was used to opt in to this lead that would give us a

9   complete dispositive defense to the case and end all this class

10  discovery was intentionally and admittedly destroyed by the

11  plaintiff.  And so we think it's just a textbook case of

12  spoliation.  And just to quickly go through the elements -- duty

13  to preserve:  Here, there was not just a duty to preserve because

14  it was, obviously, critically relevant information to this case,

15  but Mr. Reimer has filed over a dozen TCPA class actions from

16  which he's made hundreds of thousands of dollars in individual --

17  not class -- settlements, and several of those cases were already

18  filed at the time that he sent his initial demand letter in this

19  case to Medigap, my client; and Medigap responded, We think

20  there's no merit --

21      THE COURT:  Well, he had a lawyer send the demand letter;

22  is that right?

23      MR. WATSTEIN:  Well, that's -- I mean, yes, a lawyer sent

24  the demand letter, but Mr. Reimer contacted his lawyer and said,

25  This is --

*Proceedings*

1      THE COURT:  No, I'm just saying he was represented by

2  counsel at the time that he sent the demand letter.

3      MR. WATSTEIN:  Absolutely.

4      THE COURT:  You know, the scenario -- and I don't know

5  exactly; I haven't seen, at least in the record that I have, the

6  initial letter that went to Medigap, but there is a response from

7  Medigap to the lawyer, and that was back in April.  These calls

8  started happening in February, so this is within 60 days of when

9  the calls started, right?

10      MR. WATSTEIN:  That's correct.  That's correct.  There was

11  a --

12      THE COURT:  So you have a lawyer involved, and the lawyer

13  starts communicating with Medigap, and Medigap then corresponds

14  with him and says, We've got a consent form, you know, online,

15  those kinds of things, the April 19th letter, right?

16      MR. WATSTEIN:  That's correct, and Mr. Reimer conceded at

17  deposition that he had read the letter from Medigap stating

18  Medigap's position.  But it wasn't just Medigap's position that

19  he had opted in to this lead; at that point in time, Mr. Reimer

20  already had, essentially, identical pending litigation against

21  other parties that had said the exact same thing:  We have an

22  online opt-in from this individual -- often Rob K., who we now

23  know has a phone number that is one digit off from Mr. Reimer's.

24  And so that was the consistent story from everybody that

25  Mr. Reimer either sued or sent a demand letter to.  So while

*Proceedings*

1   there would be a duty to preserve just based on the fact that,

2   clearly, a computer in a case involving an online opt-in is the

3   most critical piece of evidence, but, here, you have other

4   litigation where there's a consistent story coming from the

5   defense side that we have an online opt-in; and that's case

6   dispositive.

7          And it bears noting, too, an interesting fact here:  The

8   lawyers that represented Mr. Reimer at the time, after they

9   received Medigap's responses, they declined to further represent

10  Mr. Reimer.

11         THE COURT:  And a year later, he files suit here?

12         MR. WATSTEIN:  A year later, he files suit.  We take his

13  deposition -- well, we learned shortly before his deposition that

14  the computer was gone, and --

15         THE COURT:  That was in August?

16         MR. WATSTEIN:  Correct.  And there had been discussion --

17  we were on the cusp of spending about $25,000 to do an inspection

18  of his phone, but he has an iPhone, and this was an opt-in

19  through a Windows device.  It would have been just a complete

20  waste of money.  We need the computer.

21         And I don't want to jump around too much, but I do want to

22  note what probably is the most important item in my view, and

23  that is that there is no other way to get the information that

24  was on his computer.  There's some argument that, Oh, well, what

25  about sending a subpoena to his ISP, Verizon?  The only thing

*Proceedings*

1  that a subpoena to Verizon could establish, number 1, if they

2  followed their own published data retention schedules, is that

3  information was deleted.  Networking information was deleted long

4  before this case was filed.  But the only thing that Verizon

5  could tell us is if -- it could only prove a positive:  If

6  Mr. Reimer was sitting at home connected to his Verizon internet

7  connection and opted in.  It could not tell us anything about

8  whether he submitted that opt-in from his computer from any other

9  location.  I logged in to six networks in the last 24 hours --

10  airport, hotel, Starbucks, local coffee shop, office, home -- are

11  we supposed to send a subpoena to every single ISP for every IP

12  address in the entire country?  The point is, there is no

13  alternative to the evidence that was on his computer.  Browsing

14  history, cookies, networking logs that would show that he used a

15  VPN -- which, by the way, we already have evidence of,

16  circumstantial evidence of -- and so there's just no way to get

17  the information.

18       So the prejudice to Medigap is significant.  We are

19  lacking the most critical piece of evidence in the case, and it's

20  not just an individual plaintiff case; it's a putative class

21  action where we're spending tons of money every week defending

22  the case.  We're in class discovery, and we're prejudiced and not

23  able to defend against his individual claim, which we contend

24  would end the case.

25       So going back to the elements, Your Honor, we talked about

*Proceedings*

1    duty to preserve, the fact that there was relevant information

2    lost, the fact that plaintiff caused the loss -- that's not in

3    dispute; he admits he threw away the computer.  We talked about

4    the fourth element, that there's no alternative for the lost

5    information.  And I would note that these points that I'm making

6    and the points in our briefing, they are not disputed with

7    evidence.  So we put in a declaration from Jerry Cohen, who's a

8    networking professional, and the plaintiffs had an expert, and

9    they attached an expert report to their response, but it is not

10   an expert report that goes to any of the points that are salient

11   to this motion, like alternatives for the lost computer and

12   whatnot.  It was prepared before we even filed the spoliation

13   motion.  It doesn't have anything to do with it.  Notably, they

14   didn't go back to their expert, in opposing our spoliation

15   motion, and say, Hey, can we get a declaration from you to

16   support the attorney arguments we're making about, for example,

17   subpoenaing Verizon, or sending out a bunch of third-party

18   subpoenas to AWS, which houses the website that was opted into?

19   So it's really -- our evidence is unrebutted.  There's only

20   attorney arguments.  There are some statements by Mr. Reimer,

21   who's not a computer expert.  And on top of that, I mean, the

22   case law is pretty clear that in proving the no alternative, it's

23   a pretty low bar, no alternative for the evidence.  And, here,

24   it's not disputed that the computer is gone.  There wasn't a copy

25   made of it.  It's not like other -- it's not like -- the way we

*Proceedings*

1  view this is a hybrid case.  You have destruction of tangible

2  physical evidence, the computer itself; and you also have

3  destruction of the ESI that was on the computer.  So it's

4  different from these email cases where, Well, do we really want

5  to punish the defendant because they had an automatic deletion

6  policy on their email?  It was probably unintentional.  And you

7  could go to another custodian who was copied on the emails to

8  potentially get these same emails.  No; it's gone.  It's a

9  physical device that's gone.

10         And then that brings us to the question of remedy --

11         THE COURT:  Well, no, you have to get to intent --

12         MR. WATSTEIN:  Well, okay --

13         THE COURT:  -- intent to deprive another for use in the

14  litigation.

15         MR. WATSTEIN:  Right.  And so are you traveling under

16  Rule 37, Your Honor?

17         THE COURT:  Yes.

18         MR. WATSTEIN:  So we would contend a couple of things:

19  Number 1, we satisfy Rule 37 -- and I will explain that in a

20  minute -- but we don't need to satisfy Rule 37 because, again,

21  it's not just an ESI case; he destroyed his computer.  Like, if

22  somebody were to have burned down an entire server warehouse,

23  would we really have to travel under Rule 37?  I would submit

24  that the answer is no.  But we do easily satisfy both prongs of

25  Rule 37.  There's two independent prongs, and I'll pull up the

*Proceedings*

1    rule here.

2         THE COURT:  The prejudice one, I don't think we need to

3    spend any time on.  See intent to deprive.

4         MR. WATSTEIN:  Yeah, and so -- right.  So we think that --

5    the way that we read the rule upon finding a prejudice -- and

6    I'll speak very briefly here, quickly here on this element -- [as

7    said]:  Upon finding prejudice, the Court may order measures no

8    greater than necessary to cure the prejudice.

9         Here, our contention is, the only measure that could cure

10   the prejudice is terminating sanctions, ending the case.  And I

11   want to make clear that if this were a case involving a deceased

12   family member or a serious personal injury, maybe we wouldn't be

13   taking that extreme of a position, but this is a statutory

14   damages case where the plaintiff has conceded that, Well, the

15   only thing that's at issue is some annoyance from a couple of

16   phone calls.  So it is different -- terminating sanctions in a

17   case like this are much different than terminating sanctions in a

18   case that has significant consequences for the party facing the

19   sanctions.

20        So moving on, though, to the other prong, the intent to

21   deprive, we think we've got significant evidence of that.  We

22   have a serial plaintiff who is very sophisticated.  He's highly

23   educated.  As an example of how sophisticated the plaintiff is,

24   he makes a good source of his income from financial arbitrage; in

25   other words, exploiting the inefficiencies in an efficient

*Proceedings*

1   market.  That takes some smarts.  He's also involved in foreign

2   arms transactions.  Somebody who is that sophisticated would

3   obviously know the significance of throwing away their computer,

4   particularly when they had been told on numerous occasions by

5   several different defendants that we believe you opted in and

6   gave consent to this contact by submitting an online form from a

7   computer.  So while we don't have a recording of Mr. Reimer

8   saying, you know, or a text message saying, I intentionally

9   deleted this evidence to deprive the other side of the evidence,

10  we can't think of a clearer case, absent that Perry Mason moment,

11  just based on, you know, everything that I've already talked

12  about, the fact that --

13       THE COURT:  Well, he threw away the computer in early

14  summer of 2022.

15       MR. WATSTEIN:  Correct.

16       THE COURT:  So help me put the pieces together as to why

17  you think that that action taken in early summer of 2022 was

18  taken as an intent to deprive a party of relevant information in

19  litigation.

20       MR. WATSTEIN:  Sure.  Because at that point in 2022, he

21  had numerous pending TCPA class actions in which every defendant

22  contended the exact same thing, that you opted in via computer;

23  and that opt-in is a complete defense.

24       THE COURT:  And which of the cases?  We've got this case,

25  because you've got the letter in April and then there was

*Proceedings*

1   correspondence back and forth between the lawyers about, you

2   know, he did, you know, what happened here.  What were the other

3   cases that were pending by June -- cases pending or at least

4   demand letters made where issues were raised by June of 2022

5   other than your case?

6       MR. WATSTEIN:  And I don't have the exact -- I know that

7   it's in our papers.  If you --

8       THE COURT:  I know what's in the papers, and it doesn't

9   say which ones were -- I mean, I can look at the case numbers and

10  see that, you know, '22, probably filed in 2022.  I don't know

11  what time period.  I don't know how busy their dockets are and

12  those kinds of things, and I didn't do your research for you in

13  that regard.  But, you know, you mentioned in a couple of

14  different places -- obviously, there was the one that was filed

15  here in our court in 2021, it seems to me the earliest one, I can

16  tell at least by case years.  You highlighted at least six cases

17  that you say involved the Rob -- Robert, the same last name here;

18  but, again, we're talking about an action that was taken in the

19  early summer of 2022.

20      MR. WATSTEIN:  Allegedly, Your Honor.  That is the

21  plaintiff's testimony, and there are significant reasons to doubt

22  the plaintiff's testimony, including him contending, Oh, I didn't

23  use a VPN.  We know that the lead that was filled out in this

24  case employed a VPN.  He testified that he didn't use a VPN.  We

25  put in front of him signed TCPA settle- --

*Proceedings*

1     THE COURT:  Step back.  How do you know that the lead --

2  and this was the TrustedForm certificate of authenticity -- how

3  do you know that a VPN was used in logging on at that time?

4     MR. WATSTEIN:  Sure.  So if you -- and I don't know that

5  this is necessarily in the record -- but if you do a reverse

6  lookup, which I just did last night and I've done multiple times,

7  on this IP address, it is a known -- it comes back as a known

8  VPN.

9     THE COURT:  Okay.

10    MR. WATSTEIN:  So, again, these things are very difficult

11 to establish because, you know, these VPN providers are in the

12 business of obscuring information, but it's out there on the

13 internet as a known VPN.

14    THE COURT:  Okay.

15    MR. WATSTEIN:  And I can get you that list, Your Honor, of

16 cases.  I just can't -- I don't want to waste your time by trying

17 to rifle through and identify, standing here, the exact cases

18 that were pending at that time, but when I sit down --

19    THE COURT:  Well, clearly, he had another case pending

20 because he signed a settlement agreement about the same time that

21 he was doing some other things.

22    MR. WATSTEIN:  He had several cases pending.  I just can't

23 list them all for you standing here.

24    THE COURT:  All right.  So, again, let's walk through the

25 intent to deprive component here.  So he has the letter -- or his

1    lawyer, so he's charged with that information saying he submitted

2    an online form.  We have consent in this case in April, right?

3          MR. WATSTEIN:  Correct.

4          THE COURT:  And the communications that follow on that,

5    you know:  We're closing our file; shouldn't close your file;

6    this, this, that; a fair number of emails back and forth with the

7    lawyers saying, you know, We have it, we have, you know, the IP

8    address; we have the time, all that kind of information.  So,

9    obviously, I think at that point in time, that issue was drawn in

10   this case.  But what about the other cases?  You make a big deal.

11   I mean --

12         MR. WATSTEIN:  Did you say, "What about the other cases?"

13         THE COURT:  Well, I mean, you're saying that there were

14   other cases that were going on between -- at the same time as

15   your case and prior to early summer of 2022 that raised the same

16   issue; is that right?

17         MR. WATSTEIN:  That's correct.  There were other cases

18   that I will get you the names of where the defense made the exact

19   express contention as we have in this case and as every defendant

20   has in every one of his cases, which is that, We have an opt-in

21   from you that gives us complete consent.  And I can --

22         THE COURT:  I know you've given me a list of the cases.

23   I'm just trying to find out which ones do we know that this issue

24   was presented to him prior to early summer of 2022.

25         MR. WATSTEIN:  Sure.  And if I may --

*Proceedings*

1      THE COURT:  You know what I'm trying to do.

2      MR. WATSTEIN:  I do.  And if I may, I actually have a

3  couple of the letters in front of me, so if I may just refer to

4  them.  So if you look at --

5      THE COURT:  Exhibit 9?

6      MR. WATSTEIN:  This is Docket Entry 48-1.  These documents

7  are attached to the declaration of my colleague, Matthew Keilson,

8  in support of our motion, which is at -- or the brief is at

9  Docket Entry 48.

10      THE COURT:  So this would be in Exhibit 6, starting 63

11  through 76?  Is that what you're looking at?

12      MR. WATSTEIN:  That's exactly correct.

13      THE COURT:  Okay.

14      MR. WATSTEIN:  So just to take a couple examples -- I'm

15  not going to walk through every word of all these letters, but I

16  mean, here's a letter from Bridgewater Health Supplies -- and I'm

17  on page 63 -- it's Bates stamped Reimer 317.  This is an

18  April 22, 2022, letter from Bridgewater Health, walking

19  Mr. Reimer through how it obtained the consent in that particular

20  instance, explaining that they never cold call customers, that

21  there was a valid opt-in in this case.

22      THE COURT:  You've got the bridge water one, and it looks

23  like you've got the American Automotive Alliance.  It's the

24  document right before that.

25      MR. WATSTEIN:  That is correct.

*Proceedings*

1    THE COURT:  312.

2    MR. WATSTEIN:  That's correct, and it's essentially the

3    same:  "We determined that we attempted to contact the number in

4    response to an online form submission that took place on

5    July 1, 2021" -- on a different website -- and, Here's the

6    information that we obtained in connection with that.

7    And there are several of these.  But, I mean, these alone

8    put him on notice, express notice, of the defendant's position in

9    the case.  I mean, it doesn't take a genius to understand that

10   they're saying I opted in online, and he only had one computer.

11   There's another letter at Reimer 336 -- I think that

12   letter is dated November 23, 2022 -- but, again, we don't know

13   exactly when he destroyed the computer.  We approximated summer

14   of 2022, but we don't know if that's accurate.  But, again, it's

15   just more of the same.

16   THE COURT:  All right.  So talk to me about remedy.

17   MR. WATSTEIN:  Sure.  So in our view, the only remedy that

18   could address the prejudice is dismissal, and I explained a

19   little bit earlier one of the reasons why dismissal is more

20   appropriate in a case like this.  Couple of reasons:  Number 1,

21   the vast amount of prejudice in this case doesn't come from

22   Mr. Reimer's individual claim; it comes from the class aspect of

23   the case.  We're saying we've been deprived of the ability to

24   defend against the individual claim which ends the case, and that

25   has allowed them to unlock the doors to vast class discovery,

*Proceedings*

1    total fishing expedition about all these other individuals in a

2    case against a company that sells health insurance involving PHI.

3         The next step, if this case proceeds after today, is a

4    long series of disputes in front of the Court about how we can

5    possibly be required to turn over all these copious amounts of

6    information when he destroyed the information, the evidence, that

7    we need to end the case now.  So we think that dismissal is the

8    only appropriate remedy.  And, again, this is not a case where

9    the prejudice to the plaintiff is going to be dire.  This is a

10   plaintiff that has made hundreds of thousands of dollars filing

11   these putative class actions, then settling them individually for

12   anywhere between ten and $80,000; pocketing, you know, 30,

13   40 percent of his income over the past couple of years off this

14   scheme, as we would call it; and the only thing that he loses in

15   this case is not being able to get $10,000 in statutory damages

16   for what he claims was a minor annoyance.

17        THE COURT:  And I sort of short-circuited one of your

18   arguments.  I just want to make sure -- the 37(e) analysis for

19   electronically stored information, you said there is another

20   avenue, but the real -- the computer itself, it's only the

21   electronic evidence that's on the computer.  You don't care, you

22   know, what color the computer was or anything that has to do with

23   the physical components of the computer; it's only the electronic

24   evidence in the computer.  So why isn't this really just a 37(e)

25   analysis?

18

1      MR. WATSTEIN:  Well, I think a couple of responses to

2    that.  It's unclear in the case law when there is -- most of the

3    case law involving ESI involves what is very clearly just ESI.

4    It is a document retention roll-off.  It is some metadata, but

5    the device still exists or it was imaged.  So, you know, the

6    point of Rule 37 -- and if you read all the comments in the

7    history on Rule 37 -- it was to make sure that we're not giving

8    too strict of punishment in cases where -- it's much easier to

9    delete ESI than it is to delete physical evidence, and so the

10   courts wanted to make sure that there was a uniform rule in place

11   to make sure that we're not doling out too much punishment in a

12   case, for example, where a company has a document retention

13   policy and they accidentally allow emails to roll off,

14   particularly because emails are often available through other

15   sources; there's other custodians; there's always somebody on the

16   other side of the email, right?  So that's why I would say,

17   logically, this case doesn't cleanly fit within the rubric of

18   that type of case.  It is both a physical evidence and an ESI

19   case; but, again, we think we easily satisfy Rule 37, both prongs

20   of Rule 37.

21      THE COURT:  Okay.  I think I understand your position.

22   Thank you.

23      MR. WATSTEIN:  Thank you, Your Honor.

24      MR. BARRETT:  Good morning, and thank you, Your Honor.

25   Once again, I'm John Barrett here for Mr. Reimer.  I appreciate

*Proceedings*

1 the time to present these arguments on this very serious matter

2 in person.  Mr. Reimer is here this morning.  These are attacks

3 on his credibility.

4    THE COURT:  They certainly are.

5    MR. BARRETT:  I'm sorry?

6    THE COURT:  They certainly are.

7    MR. BARRETT:  They certainly are, and I will absolutely

8 explain to you why the focus is on the wrong person.  The focus

9 should be on the entity that sold the lead to Medigap.

10    THE COURT:  That entity didn't destroy evidence, and the

11 issue in front of me is whether Mr. Reimer, a well-educated

12 Darden Business School graduate, having been involved in multiple

13 pieces of litigation, willfully and voluntarily destroyed a

14 computer in the summer of 2022.

15    MR. BARRETT:  And I think you're absolutely right to focus

16 on what he knew at that time, because what he knows now is very,

17 very different.  This is what he knew at that time.  And Your

18 Honor was reviewing the letters that are in the file regarding

19 the other cases, and I believe there was a statement made by

20 counsel that they were making in these other cases, that

21 Mr. Reimer had brought the same kinds of allegations, exactly the

22 same allegations.

23    THE COURT:  Right.

24    MR. BARRETT:  Let's look at the letters.

25    THE COURT:  They were online consent forms, okay?

*Proceedings*

1        MR. BARRETT:  Yes.  And let's look at the letters.  The

2   first one is Docket Entry 48 --

3        THE COURT:  Let's look at the letter in our case first,

4   the April 19th letter, okay?  So let's talk about the specifics

5   of our case, the letter that was sent to him or his counsel on

6   April 19, 2022.  And it says, "Your client provided their phone

7   number along with a consent for us to contact your client as part

8   of an online survey.  I have attached the certificate we received

9   for your records."

10        MR. BARRETT:  Okay.

11        THE COURT:  So your client, in April of 2022, is charged

12   with that knowledge that Medigap is saying that you consented to

13   this, we have a consent form, and here it is, and you did that

14   online.  Okay?

15        MR. BARRETT:  And let's talk about that consent form.

16        THE COURT:  Okay.

17        MR. BARRETT:  The so-called consent form, it's something

18   called a TrustedForm certificate.  Our expert has testified in

19   his report, that we've attached, that these things are frequently

20   presented by lead generators, people who are trying to make money

21   from the sale of leads, to establish to the entity that buys the

22   leads -- here, Medigap --

23        THE COURT:  What does that have to do with his destroying

24   evidence?

25        MR. BARRETT:  I just want to look specifically at that

*Proceedings*

1    TrustedForm itself.  It is of suspect use anyway.  But in terms

2    of what it says, what it says is that someone in Dyer, Indiana,

3    where Mr. Reimer does not live, submitted a lead for Medigap

4    coverage.  Mr. Reimer knew, of course, that he wasn't in the

5    market for Medigap coverage.  He's not 65 or older.  Dyer,

6    Indiana:  He wasn't in Dyer, Indiana.  He did not submit the

7    lead.  He did not use his computer.  This computer that they're

8    making, you know, the subject of this motion, the testimony was

9    that it was not used at that time, that it was collecting dust.

10   He may have used it once or twice, but when you turn it on, you

11   get a blue screen, if you're able to turn it on at all.  So he

12   was not even using this computer at that time.

13        THE COURT:  He testified that for months, he wasn't using

14   a computer --

15        MR. BARRETT:  For months --

16        THE COURT:  -- and that's a little hard to believe, to be

17   honest with you.

18        MR. BARRETT:  There is testimony that he may have used it,

19   but there's no testimony that he did.  And he explained why.

20   He's in the business development world.  He spends a lot of time

21   on telephone calls.  He uses his iPhone a lot, does business

22   work, you know, and was not at that time using his computer, so

23   that is the testimony and I believe it.  I would not be standing

24   here, Your Honor, if I didn't believe it.

25        What this case -- let's talk again about --

*Proceedings*

1       THE COURT:  All right.  So you've got him in hand and

2   you're making arguments now about how the TrustedForm certificate

3   may or may not be something that, you know, people could rely on;

4   but at the time in April of 2022, he knew this was an issue.  And

5   you're making arguments now about, Well, you know, it could be

6   scraped, it could be this, it could be that.  But the issue is he

7   was making a claim against a party, and he knew that this online

8   survey or input of his information was going to be an issue in

9   this case.  So why, then, do you say he doesn't have a duty to

10  preserve the computer, his only computer, that if he was doing

11  something online, that he would have used to do this form?  It

12  could have helped him in this case; could have hurt him in this

13  case.

14      MR. BARRETT:  So in hindsight, I think, you know, that

15  duty becomes clear.  At that time, I do not believe the duty was

16  clear.  There was no -- this letter, Your Honor, came from

17  Medigap legal, okay?  It was from their legal department, and it

18  did not --

19      THE COURT:  In response to a letter from his lawyer to

20  Medigap.  So, you know, he hired a lawyer, or had a lawyer,

21  correspond to Medigap on his behalf within weeks; and, actually,

22  during this correspondence back and forth, he gets a text message

23  from him.  So, I mean, during the entire time, you know, he's got

24  a lawyer on board.  I don't know whether it's the same lawyer

25  that represented him in some of these other cases or not, but, I

*Proceedings*

1   mean, he's ready to go, sends a demand letter -- I don't have the

2   demand letter, but I assume the April 19th letter was in response

3   to a demand letter -- and then there are all these emails back

4   and forth about, you know, We've got the IP address; we've got

5   the times; we've got this and that.  So that issue was so teed

6   up, it's hard for me to understand how you can say there isn't a

7   duty to preserve --

8          MR. BARRETT:  I --

9          THE COURT:  -- on this one letter, not counting the other

10  letters.

11         MR. BARRETT:  Your Honor, I think it would have been very

12  different if there had been a demand for preservation, and there

13  wasn't a demand for preservation.  Now, I'm not saying that's the

14  sole basis for the establishment of a duty to preserve.  All I

15  can say is, at the time, Mr. Reimer had not dealt with any kind

16  of demand for spoliation or any kind of spoliation issue at all.

17  His computer had never been inspected.  These statements are

18  being made that Medigap was, you know, accusing him of fraud.

19  When you read the correspondence between Medigap and his lawyer,

20  it doesn't say you, yourself, you know, committed fraud.  It said

21  you, yourself, went online and submitted this form.  None of the

22  other entities that he was involved in litigation with say, This

23  is your fault; you did this; you committed fraud.  The letter of

24  December 7th, Your Honor, in the other case does not say anything

25  like that.  What the letter says is that on July 1st, someone

*Proceedings*

1    visited the above-referenced website and completed an opt-in

2    form.  It doesn't say that he did.  Now --

3            THE COURT:  Let's not -- let's talk about --

4            MR. BARRETT:  Let's --

5            THE COURT:  -- this case before we move on to the other

6    one.  "While he may not remember the survey he completed, we have

7    a certificate of authenticity, as we do with all of our potential

8    clients."  April 27th email to the lawyer.

9            MR. BARRETT:  Yes.

10           THE COURT:  So, you know, some question is to -- they're

11   saying, You did it; you may not remember it; you may deny it,

12   but, you know, we think you did it.

13           MR. BARRETT:  Your Honor, it sounds like on the duty to

14   preserve issue, that that's a tough issue for us, so if we could

15   focus on the numerous other grounds for denial of this motion, if

16   I may.

17           THE COURT:  All right.  So duty to preserve, it's not

18   here, so it's lost, right?

19           MR. BARRETT:  I'm sorry?

20           THE COURT:  If there was a duty to preserve, you

21   acknowledge that it's no longer here, so the information is lost,

22   right?

23           MR. BARRETT:  The information on the computer is gone,

24   yes.

25           THE COURT:  And it wouldn't have been unreasonable for him

*Proceedings*

1   to keep the laptop, or computer, while this litigation was

2   pending.  This isn't going to cost him anything.  He just lets it

3   sit there and collect dust like he said it did for months when he

4   didn't use a computer at all in his very sophisticated business

5   activities.

6       MR. BARRETT:  It would not have cost him money, yes, Your

7   Honor.

8       THE COURT:  So we've got one, two, and three.  So what is

9   your argument about can the information be restored; and if so,

10  what have you done in order to get that information?

11      MR. BARRETT:  We are -- we have served numerous subpoenas

12  out to third parties, as counsel mentioned.  We believe this lead

13  that was provided that Medigap used to call Mr. Reimer was --

14      THE COURT:  I'm asking about the information on his

15  computer.

16      MR. BARRETT:  Oh, on his computer.

17      THE COURT:  What have you done --

18      MR. BARRETT:  On his computer.

19      THE COURT:  -- in order to find out whether the lost

20  information that he had a duty to preserve, and he destroyed, can

21  be restored?

22      MR. BARRETT:  We have not served any subpoenas in that

23  regard.

24      THE COURT:  What have you done?

25      MR. BARRETT:  We have -- I'm not -- actually, I'm not sure

*Proceedings*

1   that we have done -- actually, we have served subpoenas in that

2   regard, Your Honor.  We issued a subpoena attempting to get

3   information about who the VPN on the lead form belongs to.

4   That's a Comcast VPN -- I'm sorry -- IP address, the IP address.

5   Whose IP address is that?  We have served discovery on that

6   issue.  I believe we have a motion pending before Your Honor, or

7   we shortly will, to try to get that information.  We want to know

8   who was using that IP address.

9           THE COURT:  This is the only motion that's pending in

10   front of me.

11           MR. BARRETT:  Okay.  That issue has been the subject of

12   back-and-forth between counsel, and that will be forthcoming,

13   but --

14           THE COURT:  So you don't have the ability as you stand

15   here today to tell me that you can have any of the information

16   that was on his computer that was destroyed restored?

17           MR. BARRETT:  I cannot tell you that, Your Honor.

18           THE COURT:  So let's move to -- now, there's prejudice to

19   another party.  They say that that was a key piece of

20   information; that if they had that information, it could be used

21   to confirm their belief that he was using VPNs at the time frame.

22   So you have some circumstantial evidence relating to the other

23   settlement agreement that was at about the same time, or in May,

24   using a VPN, they say, with his computer; and that, you know,

25   they don't have the ability to look at his computer to confirm

*Proceedings*

1    that.  So it's lost.  Do they have prejudice?

2         MR. BARRETT:  Yes, that is what they're saying.  Your

3    Honor, his testimony was that he was using -- not using a VPN,

4    so --

5         THE COURT:  He had used VPNs in the past?

6         MR. BARRETT:  He had, yes.

7         THE COURT:  He didn't say when he stopped; he didn't say

8    why he would have stopped.  He says he uses his private browser.

9    He's sophisticated enough to know that he wants to use a private

10   browser, and he probably is sophisticated enough to know that

11   when you're doing things, a VPN also provides some level of

12   security.

13        MR. BARRETT:  Sure.  And, Your Honor, he, you know -- if

14   we're charging him with a certain level of sophistication, the

15   question would become, Why not just delete all of the information

16   on his computer and preserve it to avoid these kinds of problems?

17   He didn't do that.  He just got rid of it.

18        THE COURT:  It would be even worse.

19        MR. BARRETT:  That would be worse.  That would be

20   deliberate, you know, conduct, to destroy evidence.

21        THE COURT:  It would be able to track it deliberately -- I

22   mean, you would be able to get the computer, go back and see what

23   was deleted and what time frame.  So throwing away the whole

24   computer doesn't necessarily make it any better, but it may make

25   it a little bit cleaner; wouldn't be able to track information.

*Proceedings*

1       MR. BARRETT:  That is true.  So, Your Honor, we are doing

2   discovery right now --

3       THE COURT:  I'm dealing with a motion right now.

4       MR. BARRETT:  I am, too, to determine whether or not this

5   lead itself was fraudulent.  We believe it was fabricated; and if

6   we prove that it was fabricated, Your Honor, if we prove that it

7   was fabricated, his computer would have absolutely no bearing on

8   the issue, because if it was fabricated by a lead generator, it

9   wasn't -- it couldn't have been his computer that was used.  We

10   have outstanding subpoenas on that very issue right now, and we

11   will do depositions of the entity that came up with this lead.

12       THE COURT:  How does that alleviate his obligation to

13   preserve discoverable information?

14       MR. BARRETT:  Because the obligation is to preserve

15   relevant information; and if someone else created the lead,

16   fabricated the lead, that information would not be relevant,

17   right?  That is -- it would no longer be relevant.  It has no

18   relevance, no bearing on this issue at all.  We're going to find

19   out about this, Your Honor, within -- very soon, based upon the

20   subpoenas that we have issued.  We will take depositions.  If

21   Your Honor wants and prefers to again phase things so we

22   aren't --

23       THE COURT:  No.  The phasing could very well be that

24   there's no more discovery in this case.

25       MR. BARRETT:  And we think that would be the incorrect

1   decision, Your Honor, and here's why:  Counsel -- there are other

2   claims in this case that are completely unrelated to the

3   computer.  Mr. Reimer received telephone calls based on the lead

4   from Medigap.  On March 24th, he said, Stop calling me, no more

5   calls, no more calls; and the calls continued, and that is a

6   separate violation of the law.  That is contained in Count II of

7   our complaint, which is a violation of the do-not-call procedures

8   that say, When I say stop, the calls have to stop.  The calls

9   continued.  There were three or four more calls after that point.

10  So those are untouched by the computer issue.

11      The second claim that is untouched by the computer issue

12  is we have recordings of all of these calls.  Medigap records

13  their calls, and they were not complying with the Virginia TCPA

14  provisions, which is Count IV in our complaint regarding

15  identification of the telemarketer.  The telemarketer is

16  required, under Virginia's statute, to provide first and last

17  name.  That was never done by the telemarketers calling

18  Mr. Reimer.  So that claim should not go away because we believe,

19  frankly, we should be entitled to summary judgment on a claim

20  like that.  We have recordings, and the disclosures were not made

21  properly.  So that's one of the reasons that dismissal is not

22  warranted.

23      But the second reason that dismissal is not warranted is

24  because we believe that we will prove that the only fraud in this

25  case was committed by the lead generator that got a buck, 25 for

*Proceedings*

1   the lead that they sold to Medigap.  $1.25 is what Medigap paid

2   for this lead.  Lead fabrication is endemic in the telemarketing

3   world.  It is the subject of regulation by the Federal

4   Communications Commission right now, and the state attorneys

5   general.  This is a significant problem; and I am here today,

6   Your Honor, because I believe that Medigap was calling not only

7   my client, but hundreds and, potentially, thousands of other

8   people based upon a fake lead that was generated by somebody

9   operating a website called American Winner's Circle, which, for a

10  while, doesn't -- you know, doesn't even exist or didn't exist.

11  Now it exists and it directs somewhere else.  We need to talk to

12  the people that generated that lead to prove this fraud.  If we

13  prove this fraud, the computer is immaterial.

14         Dismissal is unwarranted, Your Honor, because of these

15  other claims that exist.  We need to be able to do discovery on

16  those other claims.  Dismissal is unwarranted because we need to,

17  and we are on the verge of, obtaining information relating to the

18  fraud that was committed by Medigap's, essentially, partner in

19  this transaction, the entity that generated the lead.  We need to

20  put that on trial.  We need to get to the bottom of the evidence,

21  get to the truth; and we're close to that, Your Honor.

22         Thank you, Your Honor.  I have nothing further.

23         MR. WATSTEIN:  Your Honor, if I may respond.

24         THE COURT:  Briefly.

25         MR. WATSTEIN:  So what you just heard was a lot of

1    speculation and misdirection that doesn't have anything to do

2    with the specific issues in this case.  I want to address a few

3    things kind of going backwards.

4           This idea that, Oh, we have other claims that are

5    unrelated to the computer, this is the first time they've ever

6    said that, and for good reason, because had they said it in their

7    briefing, we would have eviscerated it because it's just not

8    true.  Consent is a complete defense.  An opt-in is a complete

9    defense because the definition of telephone solicitation or

10   telemarketing, depending on the statute that we're looking at,

11   excludes a call that was requested by the other side.  So these,

12   like, specific caller identification requirements of the VTPPA

13   only apply if it's an unsolicited telephone communication; and

14   that makes sense because if you have agreed or requested to

15   receive a call, why would there be a statutory requirement that

16   the entity provide certain hypertechnical identification

17   requirements?  So in any event, that's just a complete red

18   herring.

19          The other thing that I would note is, you know, this

20   consent issue is not the only defense that we have in the case.

21   What you just heard from counsel -- one of the things you just

22   heard from counsel actually is another dispositive defense to our

23   case that was just conceded by the other side's lawyers, and that

24   is both -- so all of the TCPA claims that are asserted are

25   asserted under 227(c), which those are the DNC claims, federal

32

*Proceedings*

1    do-not-call claim, internal do-not-call claim.  Those only apply

2    to residential, non-business numbers.  Mr. Reimer testified, and

3    his own lawyer just stressed that, his iPhone, the phone number

4    at issue in this case, was his primary business device during

5    this entire time.  So in our view --

6         THE COURT:  We're dealing with the spoliation issue.

7         MR. WATSTEIN:  I don't want to get too far afield.  And

8    that was my point, is that this was a red herring; it's

9    misdirection; it has nothing to do with spoliation.

10        I do want to address -- I addressed it briefly when I was

11   first in front of Your Honor, and I want to address it briefly

12   again in response to some of the things that my colleague said --

13   they claim that they have all these subpoenas out there and

14   they're on the verge of obtaining all this information.  We have

15   no reason to believe that they will ever get anything from any of

16   these parties that they have subpoenaed.  Nothing's been

17   produced.  They don't have a declaration from anyone on the other

18   side.  Their own expert that they retained didn't put in a

19   declaration in response to our expert declaration that said they

20   can't get any of this information and it's not going to help

21   them.  And, again, all you're hearing is attorney argument:

22   We're going to get to the truth.  But, again, I want to stress

23   the most important thing:  The information on the computer cannot

24   be replaced by these alternative sources; and the reason for that

25   is you cannot reverse engineer a negative.  You can only reverse

*Proceedings*

1    engineer a positive.  In other words, you could possibly reverse

2    engineer through, for example, Verizon records, some other

3    records, including of the website that the information was

4    submitted on.  You could potentially reverse engineer that it was

5    Mr. Reimer sitting in his living room, but what you cannot

6    reverse engineer, because of the use of VPNs and the process,

7    you'll never be able to prove that it wasn't Mr. Reimer.  The

8    only way to do that is from the other end of the transaction with

9    the computer, and that's what we're missing.  And it's

10   interesting to me that they can sit here with a straight face

11   after the computer has been deleted [*sic*] and say that we should

12   have to go through all of these -- I have to answer questions to

13   my client, Why are we spending all this money in this case?  I

14   mean, that's the reality for a defendant in this type of case.

15   It's a putative class action.  And that's just fundamentally

16   unfair.

17        THE COURT:  All right.  I think I understand all of your

18   arguments.

19        MR. WATSTEIN:  Okay.  And that's it, Your Honor.  Thank

20   you.

21        THE COURT:  Thank you.  I appreciate the arguments I've

22   heard today.  I've read all the materials.  You-all are aware my

23   role as magistrate judge is one that I can't enter dispositive

24   rulings.  What has been asked for in the motion relates to a

25   dispositive ruling.  My job in this case is going to be to

*Proceedings*

1    prepare a report and recommendation to be sent to the district

2    judge.  I will tell you that I will be preparing a report and

3    recommendation.  It will not get issued until a week from Monday.

4    If the parties are able to resolve this case before a week from

5    Monday, there won't be a report and recommendation that gets

6    issued.  I'm not promising it's going to get out a week from

7    Monday, but that would be my timetable for trying to get that

8    done.  So I'm going to give you the opportunity to talk about

9    whether you want to try and get this case resolved between now

10   and then.  If not, then I'll issue my report and recommendation.

11   It will be filed in the public record, and the parties have

12   14 days to serve any objections they that may have, and then

13   District Judge Nachmanoff will take that up at a later time.

14           I am going to order today that the parties inform all

15   third parties that this matter is under consideration and the

16   discovery is stayed pending my issuance of the report and

17   recommendation and Judge Nachmanoff's ultimate decision.  So I

18   want you, to the extent that third parties have been sent out

19   subpoenas and things like that, do tell them that the Court has

20   stayed discovery.  Any other discovery that you-all have got

21   going on -- interrogatories, document requests, depositions --

22   should be stayed, any resolution of this issue.  Okay?  Any

23   questions?

24           MR. BARRETT:  No, Your Honor.

25           MR. WATSTEIN:  No, Your Honor.

*Proceedings*

1    THE COURT:  Thank you.

2    (Whereupon, the proceedings concluded at 11:03 a.m.)

3      *  *  *  *  *

4

5      <u>CERTIFICATE OF REPORTER</u>

6    I, Diane Salters, hereby certify that the foregoing

7 transcript of proceedings was prepared from an FTR Gold audio

8 recording of proceedings in the above-entitled matter and was

9 produced to the best of my ability.  Indiscernible indications

10 in the transcript indicate that the audio captured was not clear

11 enough to attest to its accuracy.

12

13          /s/ Diane Salters

14         _____

15         Diane Salters, CSR, RCR, RPR
           Official Court Reporter

16

17

18

19

20

21

22

23

24

25